```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF OHIO
                          EASTERN DIVISION
```

Jermaine Artis,                 :

    Plaintiff,              :

    v.                      :       Case No.  2:11-cv-321

Michael J. Astrue,              :       JUDGE GREGORY L. FROST
Commissioner of Social Security,        Magistrate Judge Kemp

    Defendant.              :

<u>REPORT AND RECOMMENDATION</u>

I. <u>Introduction</u>

    Plaintiff, Jermaine Artis, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income.  His most recent applications (he had filed earlier applications which were denied) were filed on December 21, 2005, and alleged that plaintiff became disabled on December 7, 2004.  He claims a disability based primarily upon cognitive disorders.

    After initial administrative denials of his claim, plaintiff was given a hearing before an Administrative Law Judge on November 13, 2008.  In a decision dated January 28, 2009, the ALJ denied benefits.  That became the Commissioner's final decision on February 18, 2011, when the Appeals Council denied review.

    After plaintiff filed this case, the Commissioner filed the administrative record on July 7, 2011.  Plaintiff filed his statement of specific errors on September 6, 2011.  The Commissioner filed a response on November 15, 2011.  No reply brief was filed, and the case is now ready to decide.

II. <u>The Lay Testimony at the Administrative Hearing</u>

    Plaintiff's testimony at the administrative hearing held in connection with his current application for benefits is found at

pages 1538 through 1570 of the record, and he also answered some questions put to him by the vocational expert. That testimony can be summarized as follows.

Plaintiff was 32 years old at the time of the hearing. He is a high school graduate and is able to read, but not well. All of his classes were special education classes. His last job was doing factory work, but he was fired for not following instructions. He had, in the past, been fired from other jobs as well, such as dishwasher at a fast food restaurant or order filler at a grocery store. At the hearing held in connection with his earlier application, he said he was a janitor for several years and was laid off for lack of work. (Tr. 1521-22).

Plaintiff testified that he suffers from high blood pressure, for which he takes medication, and asthma. He uses a breathing machine four times each day. Additionally, he has sleep apnea and uses a CPAP machine at night. He also suffers from depression. The medication he takes makes him sleepy. Lastly, he has back pain due to being overweight.

Plaintiff can lift fifty pounds and has no restrictions on sitting, walking or standing. He does household chores but does not shop because people make him uncomfortable. He goes fishing and mows grass. He reported a past history of use of alcohol and marijuana, as well as arrests for disorderly conduct and assault.

On a typical day, plaintiff gets up about 11:00, takes medicine, watches television, and takes a nap. He might walk to a friend's house to visit. He watches more television in the evening. He will sleep six or seven hours a day due to difficulty sleeping at night. He believed he could work if he could find a job.

### III. Medical and Other Records

The medical and other records in this case are found beginning on page 365 of the administrative record. They are

quite voluminous (the record itself consists of some 1584 pages) and they will not all be summarized here. The records which are relevant to the ALJ's decision can be summarized as follows.

Plaintiff's statement of errors focuses on these portions of the record. First, he relies on an evaluation done by Dr. Rahn, a psychologist, in June, 2003. By that date, plaintiff had been a client of Dr. Rahn's for about five months and had just been fired from a job due to "disobedience of orders." He had some chemical dependency issues but had been sober for about five months. Testing showed problems in the areas of attending and focusing, learning and remembering numbers and verbal concepts, and doing math. He was reading at a fifth-grade level. His full-scale IQ was measured at 71, and he scored above 70 on the separate parts of the IQ test. Dr. Rahn was "unclear" about whether plaintiff qualified for disability benefits. He thought that a referral to vocational agencies would be beneficial and that plaintiff might be able to get work if he had better training and preparation for work activity. His GAF was rated at 60. (Tr. 1271-72). At about that same time, Dr. Rahn completed a mental functional capacity assessment form, indicating that plaintiff was markedly limited in his ability to function in three areas - sustaining an ordinary routine without special supervision, accepting instructions and responding appropriately to supervisors, and traveling in unfamiliar places or using public transportation - and moderately limited in eight others. He also stated that plaintiff was unemployable under normal circumstances. (Tr. 877-78).

Next, plaintiff recounts the findings made by Dr. Griffith, his psychiatrist. She evaluated his mental capacity on February 3, 2006, and again on November 27, 2007. Both times, she stated that he had either poor or no ability to function in many areas of work-related and social activities, including dealing with

-3-

work stress and successfully completing either a workday or a
work week. She noted diagnoses of major depressive disorder,
generalized anxiety disorder, ADHD, social phobia, and borderline
intelligence. (Tr. 1300-03). He also points out a treatment
note from September 8, 2006, indicating that when he was doing
well, which was not all that often, he was still staying in bed
two days per week (Tr. 982) and that he had been fired from a job
for not following instructions despite having a good attitude.
(Tr. 983).

Plaintiff's statement of errors also reviews records from
his case manager. Those notes detail his difficulty staying on
task and following directions. E.g., Tr. 1122, 1125. The notes
also reflect comments made by plaintiff's landlord, who had
employed him for odd jobs, stating that he was terminating the
arrangement because plaintiff worked too slowly and spent too
much money on questionable amounts of supplies. (Tr. 1129).

Finally, the statement of errors acknowledges a records
review done by Michael Wagner, a state agency consultant. That
report, dated April 11, 2006, indicates that plaintiff suffered
from a dysthymic disorder and a depressive disorder as well as
social phobia and an anxiety disorder. These disorders produced
only a mild degree of limitation in plaintiff's activities of
daily living and his social functioning, but they moderately
affected his ability to maintain concentration, persistence and
pace. The form indicates moderate limitations in seven separate
areas, the most significant of which are the ability to maintain
attention and concentration for extended periods, to work closely
with others, and to interact appropriately with the public and
with supervisors. (Tr. 901-19).

In response, the Commissioner emphasizes these additional
portions of the record. In addition to the evaluations done by
Dr. Griffith in 2006 and 2007, she also evaluated plaintiff's

mental functioning in 2005, and rated him as extremely limited in four areas, including maintaining attention and concentration for extended periods and working closely with others, and as markedly limited in four other areas, including getting through a normal workday or workweek and maintaining schedules and regular attendance. (Tr. 692). The Commissioner also directs the Court's attention to a letter written on August 10, 2006, by plaintiff's vocational rehabilitation counselor, David Cingle, who reported that plaintiff presented "many vocational challenges" and that his independent efforts to find work resulted in his being fired from three different jobs for "inability to stay on task, poor work performance as well as attitude." Mr. Cingle thought that plaintiff's inability to maintain employment was "in large part because of his disability." (Tr. 832).

IV. The Vocational Testimony

Ms. Ewers, a vocational expert, also testified at the administrative hearing. Her testimony begins at page 1570. She noted that plaintiff had worked as store laborer, a job that was medium and unskilled, and that other jobs plaintiff had done, such as working in a fast food restaurant or a factory, involved only simple, repetitive work. She was asked a series of questions about a hypothetical person who, as the question was finally phrased, could work at all exertional levels but who could not climb ladders, ropes, or scaffolds, or work around hazards; who could perform only low-stress jobs with one- or two-step job instructions which involved simple tasks requiring little, if any, concentration, and which did not involve production quotas, over-the-shoulder supervision, or complex or detailed instructions; who could not have more than limited contact with co-workers or supervisors and could not deal directly with the public; and who was limited to jobs which

-5-

required no more than third-grade reading skills and no math skills. Ms. Ewers testified that such a person could not perform any of plaintiff's past work, but he could do about 10,000 jobs at the medium exertional level and about 5,000 jobs at the light exertional level. Such jobs would include hand packager, spray painter, washer, order filler, laundry folder, small parts assembler, warehouse checker and machine tender.

V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 25 through 39 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements of the Social Security Act through March 31, 2007. Next, he found that plaintiff had not engaged in substantial gainful activity from his alleged onset date of December 7, 2004 through the date of the decision. As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including asthma, borderline intellectual functioning, depression/anxiety, sleep apnea, and obesity. The ALJ also found that these impairments did not meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform work activity at all exertional levels but that he could not work in an environment which would expose him to pulmonary irritants. He also could not climb ladders, ropes, or scaffolds, or work around hazards. From a psychological standpoint, plaintiff could perform only low-stress jobs with one- or two-step job instructions which involved simple tasks requiring little, if any, concentration, and which did not involve production quotas, over-the-shoulder supervision, or

complex or detailed instructions.  Additionally, he could not do a job requiring teamwork, could not have more than limited contact with co-workers or supervisors, could not deal directly with the public, and was limited to jobs which required no more than third-grade reading skills and no math skills.  The ALJ accepted the vocational expert's testimony that someone with such limitations could still perform a significant number of jobs.  As a result, the ALJ concluded that plaintiff had not demonstrated an entitlement to benefits.

     VI. <u>Plaintiff's Statement of Specific Errors</u>

 In his statement of specific errors, plaintiff raises two following issues.  First, he contends that the ALJ erred by finding that his combination of impairments did not satisfy the criteria for disability set out in Section 12.05(C) of the Listing of Impairments.  Second, he argues that the ALJ did not accord appropriate weight to the opinions of the treating sources, or, alternatively, did not adequately explain why their opinions were discounted.  The Court generally reviews the administrative decision under this legal standard:

 <u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir.

1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

In support of his first assignment of error, plaintiff argues that he has satisfied the requirements of Section 12.05(C) of the Listing of Impairments.  That section presumes a person to be disabled if the person suffers from mental retardation with a valid IQ score of between 60 and 70 and has, in addition, another severe impairment.  Plaintiff points to IQ testing done when he was eleven, which produced scores of 69 and 70 and which showed deficits in areas of adaptive functioning, and to Dr. Rahn's later testing, which produced scores barely above 70, with some margin for error, and Dr. Rahn's suggestion that plaintiff was mildly mentally retarded.  Plaintiff also criticizes the ALJ for supporting his finding of an absence of mental retardation with evidence that plaintiff had been able to live independently since high school and hold a number of jobs, arguing that the ability to perform those types of functions is not mutually exclusive of mental retardation.  Since plaintiff also was found to have other severe impairments, he argues that all the elements of this Listing have been satisfied.

The ALJ placed heavy reliance on the later test scores reported by Dr. Rahn as being more indicative of plaintiff's ability than the fifth grade scores, which the ALJ stated were

-8-

probably due to either a poor test effort or distractions during the testing process. The notes from that testing process indicate a distinct lack of motivation on plaintiff's part and a poor attitude, so there is some support for the ALJ's observations. (Tr. 858-60). Although the fact that plaintiff can live independently is not determinative of the issue of whether he suffers from mild mental retardation, it is some evidence which the ALJ was entitled to consider in the context of the entire record. See, e.g., West v. Com'r of Social Security, 240 Fed. Appx. 692 (6th Cir. July 5, 2007)(ALJ could use various activities of daily living and work history to discount claim of mental retardation); Brooks v. Astrue, 2010 WL 1254323, *8 (N.D. Ohio March 24, 2010)(noting that an ALJ is permitted to use "life experience factors" in evaluating a claim of mental retardation). While there is some authority for the proposition that such factors as the ability to make change, ride public transportation, visit with friends, do household chores, or complete the sixth grade may not be used to invalidate an otherwise valid IQ score, see Brown v. Secretary of HHS, 948 F.2d 268 (6th Cir. 1991)(and see also Dragon v. Com'r of Social Security, 2012 WL 987758 (6th Cir. March 26, 2012)), this case involves only a questionable IQ score within the Listing range derived when plaintiff was eleven, and more recent scores that do not satisfy the Listing. Under all of the circumstances, the ALJ had a reasonable basis for his finding that the factors necessary to prove disability under Section 12.05(C) were not present here.

Plaintiff's second assignment of error takes issue with the ALJ's rejection of the opinions of the treating source opinions, particularly Dr. Griffith's 2006 and 2007 evaluations, and, to a lesser extent, the opinions expressed by Dr. Rahn and by Mr. Cingle. He argues that the ALJ's statement that the functional restrictions incorporated into the hypothetical question posed to

the vocational expert actually tracked Dr. Griffith's findings is not accurate, and that had her actual conclusions been incorporated into the ALJ's residual functional capacity assessment, it is likely that plaintiff would have been found disabled. To the extent that the ALJ discounted, rather than accepted, Dr. Griffith's findings, plaintiff contends that the record does not contain evidence sufficient to undermine the validity of her conclusions. He also argues that the ALJ did not cite to the various factors set forth in 20 C.F.R. §404.1527(d) when discounting Dr. Griffith's opinion, and that he did not therefore adequately articulate his reasoning process. He makes much the same argument about the way in which Dr. Rahn's opinion was considered.

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. Bull v. Comm'r of Social Security, 629 F.Supp. 2d 768, 780-81 (S.D. Ohio 2008), citing Cornett v. Califano, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979).

A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. The weight given such a statement depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. §404.1527; Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985). In evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that

opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).

If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference.  Harris, 756 F.2d at 435.  The Commissioner may have expertise in some matters, but cannot supplant the medical expert.  Hall v. Celebrezze, 314 F.2d 686, 690 (6th Cir. 1963).  The "treating physician" rule does not apply to a one-time examining medical provider, and the same weight need not be given to such an opinion even if it favors the claimant.  Barker v. Shalala, 40 F.3d 789 (6th Cir. 1994).

If the Commissioner does not give controlling weight to the opinion of a treating physician, the Commissioner is required to explain what weight has been assigned to that opinion, and why.  Failure to articulate the reason for discounting such an opinion with a level of specificity that allows the claimant to understand why his physician's views have not been accepted, and to allow the Court to review the ALJ's bases for making that decision, is almost always reversible error.  Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007); Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, plaintiff is correct that the ALJ purported to incorporate a number of Dr. Griffith's findings into his residual functional capacity determination.  It is often true that if a claimant has poor or no ability to perform certain work-related functions, that person will not be employable.  However, the specific areas in which Dr. Griffith believed plaintiff had no

-11-

real ability to function were areas which are not necessarily required in every employment situation.  Examples of such matters include the ability to work in close proximity to others or to deal with the public and with co-workers.  The hypothetical question posed to the vocational expert asked if jobs exist for individuals who are absolutely precluded from engaging in such activities, and the expert identified jobs not requiring them.  Thus, to some extent, the ALJ accepted, rather than rejected or discounted, Dr. Griffith's views.

But it is also clear that some of Dr. Griffith's views - and similar views expressed by Dr. Rahn - were rejected, as, for example, her opinion that plaintiff could not complete a workday or workweek without significant interruption from psychologically-based symptoms.  The question then becomes whether the record supports the decision not to give these views controlling weight, and whether the ALJ adequately explained why he did not do so.

The ALJ did explain, in sufficient detail, that he did not accept the totality of Dr. Griffith's diagnoses, and that finding is supported by the absence of any recent treatment records or reported symptoms of matters like ADHD or social phobia.  See Tr. 34.  He then concluded that because these diagnoses were not accepted, Dr. Griffith had likely overstated the degree of plaintiff's limitations.  The ALJ also noted an inconsistency between Dr. Griffith's findings and plaintiff's own statement that he was able to tolerate work activity, but that his employers simply did not believe he was performing well enough to justify his retention.  That inconsistency does appear in the record and it could have led a reasonable person to discount Dr. Griffith's more extreme findings to some degree.  The ALJ also devoted a good deal of discussion to why he did not accept Dr. Rahn's conclusions, including the fact that Dr. Rahn also stated

plaintiff could not do things that plaintiff himself appeared capable of doing and actually did, and that there was no evidence that plaintiff had needed a job coach in some of his work situations. Finally, the ALJ described plaintiff's various activities of daily living in some detail (Tr. 36) and found those activities indicative of a sedentary lifestyle dictated more by choice than by plaintiff's documented impairments, and the ALJ also relied on the state agency reviewer's assessment, which was consistent with the ability to work with restrictions. All in all, the Court finds that the ALJ reached a conclusion that is supported by evidence of record and explained his reasoning process well enough to satisfy the mandate of §404.1527(d), as explained in Wilson and Rogers. Therefore, his second claim provides no basis for overturning the administrative decision.

## VII. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that the Court enter judgment in favor of the Commissioner and dismiss this case.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence

or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge